EMPLOYERS MUTUAL CASUALTY CO.

v.

ARBELLA PROTECTION INSURANCE CO. et al.

No. 2009–330–Appeal.

Supreme Court of Rhode Island.

July 12, 2011.

1. In the petition for declaratory judgment that it filed in the instant case (see section "I B" of this opinion, *infra*), Employers Mutual Casu-

James D'Ambra, Esq., Providence, for Plaintiff.

Charles N. Redihan, Jr., Esq., Providence, for Defendant.

Present: SUTTELL, C.J., GOLDBERG, FLAHERTY, ROBINSON, and INDEGLIA, JJ.

### OPINION

Justice ROBINSON for the Court.

The defendants, Arbella Protection Insurance Company and Arbella Insurance Group (Arbella),[1] appeal from the Superior Court's grant of partial summary judgment in favor of the plaintiff, Employers Mutual Casualty Company (Employers). In granting partial summary judgment, the hearing justice determined that Em-

alty Company named as defendants the following entities and persons: Arbella Protection Insurance Company, Arbella Insurance Group, Viking Stone Corporation, Ronald Destremps, and Mildred Destremps.

ployers did not owe a duty to defend or indemnify the insured party, Viking Stone Corporation (Viking Stone), in connection with a certain civil action wherein Viking Stone was named as a defendant. On appeal, the defendants argue, *inter alia,* that genuine issues of material fact precluded the grant of summary judgment. For the reasons set forth below, we agree and therefore vacate the judgment of the Superior Court.

## I

### Facts and Travel

### A

### The Underlying Civil Action Against Viking Stone

The insurance coverage dispute at issue in this case stems from a civil action brought by Ronald Destremps and Mildred Destremps against Viking Stone and a principal of that corporation, Frank Mello, and his wife Shirley Mello. The Destremps filed their complaint in September of 2007 in the Superior Court for Newport County.[2] In the first count of their complaint, the Destremps averred that they were the owners of real property located at 1570 Fish Road in Tiverton, and they further averred that their property was directly across the street from a quarry located at 1635 Fish Road, which quarry was owned and operated by Viking Stone.

The complaint alleged that Frank Mello was "actively involved" in the operation of the quarry and that the Mellos owned other property "on Fish Road adjacent to" the Viking Stone property that was used in connection with the quarry operation. The complaint further alleged that Viking Stone had begun its quarry operation on Fish Road "in or about 2001." The com-

plaint then set forth the following allegation:

> "Over the years since then, Viking Stone and defendant Frank Mello have caused water containing contaminants from the quarry operation to cross over and under Fish Road from their respective properties and onto the Destremps' property."

The Destremps further alleged that, "[a]s a result, numerous trees and other vegetation" on their property had been killed; in addition, they alleged that the foundation of their home had been "infiltrated by the contaminated water;" and they also alleged, "on information and belief," that the "quality of the soils and well" on their property had been impaired. The Destremps also alleged that "water from Viking Stone's quarry operation [from] time to time has flooded Fish Road causing the road to be impassable and dangerous."

The first count of the complaint additionally alleged that the Destremps had requested that "defendants take action to prevent water from the quarry operation to continue to flood their property," but it then averred that defendants had "failed and refused to do so." The Destremps asserted that, as a result of what they alleged in their complaint, their property "continue[d] to be damaged * * *." They further alleged that, unless defendants were "enjoined from depositing water under and over Fish Road" onto their property, they would suffer "further irreparable harm."

The second count of the Destremps' complaint incorporated all of the allegations contained in the first count and then proceeded to further allege that "[t]he flooding condition" caused by Viking

2. The underlying civil action is currently pending and is captioned as follows: *Ronald Destremps and Mildred Destremps v. Aggregate* *Materials, LLC d/b/a Viking Stone Corporation,* C.A. NC 07–0492.

Stone's quarry operations "constitute[d] a public and/or private nuisance." The Destremps requested that the court enjoin defendants "from causing water from [the] quarry operation to be deposited on, over, and under Fish Road [and] onto" their property, and they also sought an award of compensatory damages, punitive damages in the amount of $1 million, and attorneys' fees.

At the time that the Destremps filed their complaint in the underlying civil action (September of 2007), Viking Stone was insured by Employers, the plaintiff in the instant case. Arbella, the defendant in the instant case, had previously provided insurance coverage to Viking Stone under a commercial general liability policy from March 30, 1999 through November 6, 2002. It appears that Viking Stone was uninsured from the latter date until March 30, 2004—at which time Employers began to provide it with insurance coverage, also under a commercial general liability policy. Both the Arbella and the Employers commercial general liability policies provided coverage for property damage which was "caused by an 'occurrence'" and which took place "during the policy period." Significantly, *both* policies defined an "occurrence" as being "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

## B

### Employers' Petition for Declaratory Judgment and Motion for Summary Judgment

On April 11, 2008, Employers filed in the Superior Court for Providence County a petition for declaratory judgment, seeking a declaration that Arbella had a duty to defend and indemnify Viking Stone in connection with the Destremps' complaint. In its petition, Employers alleged that, upon information and belief, Arbella had provided commercial general liability coverage to Viking Stone "from at least March of 1999 through 2002." Employers contended that, because the Destremps' complaint in the underlying civil action [3] alleged that Viking Stone began its quarry operation in or about 2001 and further alleged that since that time Viking Stone had caused water to come onto and damage their property, Arbella's "defense obligations" with respect to the Destremps' complaint were "triggered" under Arbella's liability policy. Employers alleged that Arbella had "failed to provide a defense" to Viking Stone, and it further alleged that Employers had been providing a defense to Viking Stone "given Arbella's breach of its defense obligations." Accordingly, Employers sought a declaration that Arbella had breached its duty to defend and indemnify Viking Stone, and it requested that the court "declare that Arbella's defense obligations [were] primary to those of Employers" and that Employers should therefore "be reimbursed for defense costs it ha[d] incurred due to the wrongful breach by Arbella of its duty to defend" Viking Stone.

On December 8, 2008, Employers filed a motion to amend its petition for declaratory judgment so as to include a second count. In that second count, Employers alleged that the facts "as alleged in the underlying complaint filed by the Destremps trigger one occurrence under the Arbella policy and as such no coverage is afforded to Viking Stone under [Employ-

**3.** It should go without saying that the "complaint in the underlying civil action" that is referenced in the text is the complaint filed by the Destremps in the Superior Court for New-port County in September of 2007, wherein Viking Stone and the Mellos were named as defendants. *See* footnote 2, *supra.*

ers'] policy." Employers further averred that, as a result, it did "not owe a defense or indemnity to Viking Stone * * * given that there is only one trigger of occurrence, which is under Arbella's policy, for the damages claimed in the underlying complaint." For that reason, Employers requested that the court declare (1) that the facts claimed in the Destremps' complaint "triggered" one occurrence under Arbella's policy and (2) that, accordingly, no coverage is afforded to Viking Stone under Employers' policy with respect to the claims made in the underlying complaint against Viking Stone. The defendants did not object to Employers' motion to amend; and on February 3, 2009, an order entered granting the motion.

On April 20, 2009, Employers filed a motion for summary judgment with respect to both counts of its amended petition for declaratory judgment. It stated that it was seeking a declaration (1) that Arbella owed a duty to defend and indemnify Viking Stone in connection with the Destremps' complaint and (2) that the facts claimed in the Destremps' complaint "triggered" one occurrence under the Arbella policy and that, for that reason, no coverage was afforded to Viking Stone under the Employers policy.

In support of its motion for summary judgment, Employers stated that the central issues presented were: (1) "whether the property damage alleged by the plaintiffs in the underlying complaint is the result of one occurrence or multiple occurrences" and (2) "when did the alleged property damage occur for the purpose[ ] of insurance coverage." As a starting point, Employers noted that its insurance policy, which provided coverage to Viking Stone from March 30, 2004 to March 30, 2008, provided liability protection for property damage *only if* the damage was (1) "caused by an 'occurrence,'" the latter

term being defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions," *and* (2) the damage occurred "during the policy period." Employers further noted that the Arbella policy, which provided coverage to Viking Stone from March 30, 1999 to November 6, 2002, contained identical provisions with respect to coverage for property damage.

Employers contended that, "in order for there to be any potential coverage under the [Employers] policy, the damage as alleged by the [Destremps] must fit the definition of 'property damage' caused by an 'occurrence' as defined in the [Employers] policy, which occurrence took place during the policy period." Employers contended that there existed no potential for such coverage because the Destremps' complaint alleged that contaminated water had flowed onto their property and caused damage since 2001. According to Employers, the facts alleged in the Destremps' complaint therefore related to a single "occurrence" that took place *before* the Employers policy period began in 2004; Employers asserted that, as a result of the foregoing considerations and pursuant to the clear terms of its policy, it had no duty to defend or indemnify Viking Stone and was entitled to judgment as a matter of law.

## C

### The Materials Submitted in Support of Employers' Motion for Summary Judgment

Employers submitted various documents to the court in support of its motion for summary judgment. Those documents included: (1) the Destremps' complaint in the underlying civil action; (2) the Destremps' answers to Viking Stone's interrogatories in the underlying civil action; (3) the Destremps' memoran-

dum in support of their motion for a temporary restraining order and for a preliminary injunction against Viking Stone in the underlying civil action; (4) the affidavit of Ronald Destremps which was submitted in support of the just-mentioned motion for injunctive relief; and (5) the deposition testimony of Frank Mello taken in the underlying civil action.

### 1. The Destremps' Answers to Interrogatories

The Destremps' answers to Viking Stone's interrogatories in the underlying civil action included the following two notable exchanges:

"6. Please describe in detail the *first occasion* when the plaintiffs allege that Defendant Viking Stone Corporation caused water to cross over and under Fish Road and onto the plaintiffs' property, whether or not a complaint was made at the time, including the year, month and date, if possible.

*"ANSWER: Sometime in either 2002 or 2003* I found my basement filled with more than two feet of water and I had to pump it with a sump pump. Our sump pumps only activate when the depression across the street is full.

"7. Please describe in detail *each and every occasion* in which the plaintiffs allege the Defendant Viking Stone caused water to cross over and under Fish Road and onto the plaintiffs' property, whether or not a complaint was made at the time, including the year, month and [d]ate, if possible.

*"ANSWER:* On *numerous occasion[s]* over the past five years." (Emphasis added.)

### 2. The Destremps' Memorandum of Law and the Affidavit of Ronald Destremps

The Destremps' memorandum of law that was submitted in support of their motion for a temporary restraining order and for a preliminary injunction in the underlying civil action contained the following statement:

"Since 2002, the quarry has been operated by defendant [Viking Stone]. Ever since Viking Stone has operated the quarry Mr. and Mrs. Destremps have suffered the *continual* discharge of silty water from the quarry." (Emphasis added.)

The memorandum asserted that the discharge of water onto the Destremps' property "occurs for the most part as a result of the deliberate actions of Viking Stone * * *." The memorandum contended that "Viking Stone has no right to allow or cause the water that collects on its property from its quarry to leech into the property of the plaintiffs," and it further asserted that the discharge "is no act of nature * * * [but] is a direct result of Viking Stone's deliberate act of directing its quarry water down the hill and under and over Fish Road onto the plaintiffs' property."

In support of their motion for injunctive relief, the Destremps had also submitted the affidavit of Ronald Destremps dated May 22, 2008, which stated that the property located across the street from his residence had been "operated as a quarry for as long as we have lived at our Fish Road home, under different owners." In his affidavit, Mr. Destremps further stated as follows:

"Prior to 2002 we never had a problem with water coming onto our property. However, since Viking Stone took over in 2002 we have experienced *continual* flooding of our property from its quarry operation." (Emphasis added.)

In his affidavit, Mr. Destremps averred that he and his wife "have observed *many times* exactly how the silty water enters

our property." (Emphasis added.) He stated that "[t]he quarry operation takes place on a steep hill on Viking Stone's property," and he stated that "[t]here are large ponds or pools of water up there" with "an earthen dam around one or more of the ponds at the top of the hill." He then stated that there was "a large depression" at the bottom of the hill on Viking Stone's property "adjacent to Fish Road."

Mr. Destremps then averred as follows in his affidavit:

"During the course of a dry day my wife and I have observed *on several occasions* a Viking Stone backhoe opening the earthen dam around one of the ponds at the top of the hill to cause water to run down the hill into the dry depression below, filling it to 5 to 6 feet in some places. * * * The water is loaded with silt.

" * * *

"[O]n May 11 and 12, 2008 my wife and I observed and photographed an employee of Viking Stone opening one of the earthen dams to allow water [to] run down the hill to the depression below. " * * *

"The water from the depression on Viking [S]tone's property *continually* leeches into our property through the rocky soil underneath (and sometimes over) Fish Road. My wife and I have observed this condition since 2002. " * * *

"We have had to install two sump pumps in the basement of our home. They run constantly whenever the water which Viking Stone empties into the depression at the bottom of the hill rises above the water table." (Emphasis added.)

### 3. The Deposition Testimony of Frank Mello

Finally, in further support of its motion for summary judgment, Employers sub-mitted to the court the deposition testimony of Frank Mello that had been taken on July 9, 2008 in the underlying civil action. In that deposition, Mr. Mello acknowledged that part of the quarry property was located adjacent to Fish Road, but he asserted that that property was "not owned by Viking Stone." He also acknowledged that water collected on land adjacent to Fish Road on the side of Fish Road where he operated his quarry. However, he stated that the land where the water collected was "[E]ast" of the parcel that he and his wife owned, and he averred that that land was owned by the Town of Tiverton. When asked how he knew that the land where the water collected was owned by the Town of Tiverton and not by Viking Stone, Mr. Mello stated, "We have an engineer who checked it out." He also confirmed that that land was not "used in [any way] in the quarrying operation."

In his deposition, Mr. Mello denied that there were any "ponds or depressions where water collects up on the top of the hill," where his quarrying operations took place. Mr. Mello stated that, instead, water collected on the "floor of the quarry." He acknowledged that water had gone down the hill where the quarry operated and onto the land that he averred was owned by the Town of Tiverton, but he stated that that flow of water occurred "naturally."

In response to a question with respect to what steps, if any, he planned to take to prevent water from leaching under Fish Road, Mr. Mello stated: "I don't believe it's ever leached under Fish Road." As a basis for that statement, he averred that "[t]he material that abuts the road is impervious" due to its "clay content." When asked whether he had ever observed water "flowing" onto the Destremps' property,

Mr. Mello stated: "I have observed stagnant water, not flowing." When further asked whether he had noticed that the water was "silty," Mr. Mello responded: "It looked clear."

Mr. Mello did acknowledge that a "berm" had been installed on top of the hill where the Viking Stone quarry operated and that it was installed "[t]o control the water;" however, when asked whether either he or anyone else associated with Viking Stone had in the past two years made an opening in the berm to allow water out, he averred that he was "positive" that they had not. Mr. Mello was then asked the following question:

> "[I]f I were to suggest to you that a backhoe has been observed within the last couple of months on more than one occasion making an opening in that earth and berm, [would you] tell me that that's not true?"

To that question, Mr. Mello responded: "You're dam[n] right I would."

## D

### Employers' Arguments in Support of its Motion for Summary Judgment

Based on the facts alleged in the Destremps' complaint and on certain statements contained in the additional documents that it submitted to the court, Employers contended that the Destremps' property damage claim arose from a single "occurrence," which it described as Viking Stone's "continuous pattern and practice of allowing water to flow from its property onto the plaintiff's property." Employers contended (1) that, because the "alleged continuous discharge is claimed to have resulted in the continual flooding of the plaintiffs property * * * there was but one, proximate, uninterrupted, continuous cause resulting in the underlying plaintiff's damages;"

and (2) that that one cause occurred before Employers began to insure Viking Stone—*viz.*, at some time between 2001 and 2003. Although according to the Destremps' complaint (as Employers construed it), the flooding had continued after the end of the Arbella policy period and into the Employers policy period, Employers asserted that, as long as the flood damage arose from one proximate cause, there would nonetheless be a single occurrence for the purpose of insurance coverage; and it asserted that that occurrence clearly did not take place during the Employers policy period.

Employers noted (1) that the insurance policies of both Employers and Arbella defined a single occurrence as including "continuous exposure to 'substantially the same general harmful conditions'" and (2) that, therefore, the policies "unambiguously provide coverage for injury taking place over a period of time." Employers asserted that there was "no way to distinguish between individual instances of water discharge," and it stated that the Destremps did "not point to individual instances of water discharge," but rather they alleged continuous flooding of their property. Employers contended that, because it was only obligated to pay on a per occurrence basis, "regardless of whether there was further injury during [Employers'] policy period, there was still only one cause or 'occurrence,' which resulted in continuous property damage" and therefore it was not obligated to indemnify or defend Viking Stone.

## E

### The Hearing on Employers' Motion for Summary Judgment

On August 4, 2009, a hearing on Employers' motion for summary judgment was held before a justice of the Superior

Court. At the hearing, counsel for Employers noted that Arbella had begun to provide a defense to Viking Stone in the underlying civil action, and he stated that he would agree to limit his argument at the August 4 hearing to that portion of his motion that sought a determination with respect to count two of Employers' amended petition, which count requested a declaration that there was no coverage afforded to Viking Stone under Employers' policy.

Counsel for Employers argued at the hearing that there had been only "one occurrence" that caused the Destremps' property damage rather than "multiple occurrences." He asserted that it was undisputed that that "one occurrence" (which he characterized as "continuous exposure of constant water leaking from Viking Stone") began *before* 2004, which was the year when Employers began to insure Viking Stone. Counsel for Employers noted that the evidence indicated that the flooding began sometime between 2001 and 2003, and he asserted that "certainly there is no question that [Employers] has no duty [to indemnify or defend Viking Stone] because the events all occurred prior to 2004," whether in 2001, 2002, or in 2003.

In response, counsel for Arbella asserted (1) that "[t]here [was] absolutely no proof that the flooding was a single incident" and (2) that there was no proof as to the cause of the flooding. He noted that "the evidence in the case is scant," pointing out that there was no expert testimony with respect to the causation of the flooding. He further noted that the Destremps had stated in documents submitted to the court in the underlying civil action that the flooding had continued at least until 2008—that is, until well after Employers came on the risk. He also pointed out that Mr. Mello denied in his deposition that Viking Stone had caused *any* water to flood onto the Destremps' property; he

noted that Mr. Mello had further stated at his deposition that the property adjacent to the road where the Destremps alleged that water collected was not Viking Stone's property, but rather was the property of the Town of Tiverton. Counsel for Arbella contended that it was possible that the flood water could have been coming up from the ground; he contended that it would be necessary "to have an expert to prove where it came from, how it got there, what caused it."

With respect to Employers' duty to defend, counsel for Arbella asserted that, looking within the four corners of the complaint, the Destremps "simply claim that the flooding starts after Viking began operating a quarry and [that] it's continued since then, but there's nothing further," and he argued that that allegation "theoretically raises potential for coverage by both Arbella and [Employers]." He contended that, as a result, both insurers had a duty to defend until the issue of the underlying liability was resolved.

Counsel for Arbella then urged the court to deny the motion for summary judgment as to the duty to defend because there existed an "underlying factual dispute" with respect to whether an occurrence causing the property damage took place during the period of Arbella's policy coverage—or during the period of Employers' policy coverage. He argued that, if the hearing justice determined that there had been just one occurrence, she would be "making a factual decision" in spite of the fact that, upon reading the complaint in the underlying civil action, it is not evident "whether this continuous flooding is one continuous act or whether there's a number of different acts * * *." He pointed to the fact that the complaint indicated that the flooding continued over a period of years, but did not reveal what the cause

was or whether it was a single event or multiple events.

In response, counsel for Employers argued that, based on the evidence in the underlying civil action, including the complaint, answers to interrogatories, and testimony from the injunction hearing, it was "clear [that] damage occurred prior to 2004." Employers then asserted that that fact was all that was needed for the court to grant its motion for summary judgment.

The hearing justice was not persuaded by Arbella's contention that there was not sufficient evidence to determine the cause of the flooding. She stated that that contention dealt with "issues of fact with respect to the *ultimate liability* of Viking" in the underlying civil action, implying that those issues were irrelevant to the issues before her. (Emphasis added.) In response, counsel for Arbella contended that the court was "being asked [by Employers] to make a factual decision * * * to decide the flooding that occurred is a single action," and he asserted that there was not sufficient undisputed factual evidence for the court to make a determination as to that issue. The hearing justice disagreed, stating that "[w]hat we know * * * is that [the flooding] happened sometime before 2004. Whether it was 2001, 2002, 2003, it started prior to 2004."

The hearing justice observed that the language in the insurance policies defining "occurrence" as including "continuous or repeated exposure" was meant to assist insurers such that they would not have to pay claims for multiple occurrences when they were the result of exposure to the same condition. She then indicated that the definition of an occurrence contained in both policies constrained her to find that, because the occurrence was alleged by the Destremps to have started prior to 2004, it could not be "anything but one occurrence" under the definitions set forth in

the insurers' liability policies. Further, with respect to the issue of the lack of expert testimony, the hearing justice stated that she could not "take speculation as to what an expert may or may not ultimately say," and she stated that it was not the duty of Employers' counsel to provide an expert in a declaratory judgment action related to issues of coverage.

The hearing justice went on to grant Employers' motion for summary judgment. In making her decision, she noted that she recognized that it was for the court to decide whether genuine issues of material fact were present, "as opposed to making that determination." Thereafter, the hearing justice ruled as follows:

> "Based on the language of the insurance policy, the specific definition of occurrence being the continuous or repeated exposure to substantially the same general harmful conditions, and based upon the manner in which the allegations are pled in the plaintiff's complaint and declaratory judgment complaint against Viking, I find that there are no genuine issues of material fact with regard to [Employers'] coverage."

On August 21, 2009, an order entered stating: (1) that Employers "has no duty to defend or indemnify Viking Stone" in the case brought by the Destremps; (2) that there was an issue of fact "as to whether or not Arbella Protection Insurance Company, Arbella Insurance Group has a duty to defend or indemnify Viking Stone in said matter;" and (3) that "Rule 54(b) certification [would be] made" with respect to the court's declaration that Employers owes Viking Stone no duty to defend or indemnify with respect to the claims made against it. On the same day, judgment entered pursuant to Rule 54(b) of the Superior Court Rules of Civil Procedure in favor of Employers with respect to

count two of the amended petition for declaratory relief.

Arbella filed a timely notice of appeal. On appeal, Arbella argues, *inter alia,* that the Superior Court judgment should be reversed because genuine issues of material fact precluded the grant of summary judgment.

## II

### Standard of Review

It is a fundamental principle that "[s]ummary judgment is a drastic remedy, and a motion for summary judgment should be dealt with cautiously." *Estate of Giuliano v. Giuliano,* 949 A.2d 386, 390 (R.I.2008) (internal quotation marks omitted); *see also Plainfield Pike Gas & Convenience, LLC v. 1889 Plainfield Pike Realty Corp.,* 994 A.2d 54, 57 (R.I.2010). This Court has stated that "summary judgment should occasion the termination of a case only where it is absolutely clear that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law." *Estate of Giuliano,* 949 A.2d at 394 (internal quotation marks omitted). We review the grant of a motion for summary judgment in a *de novo* manner, and we apply the same standards and rules as did the hearing justice. *Papudesu v. Medical Malpractice Joint Underwriting Association of Rhode Island,* 18 A.3d 495, 497 (R.I.2011); *see also Beacon Mutual Insurance Co. v. Spino Brothers, Inc.,* 11 A.3d 645, 648 (R.I.2011); *Estate of Giuliano,* 949 A.2d at 391. We have stated that "[s]ummary judgment is appropriate when, viewing the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party, the court determines that there are no issues of material fact in dispute, and the moving party is entitled to judgment as a matter of law." *Delta Airlines, Inc. v. Neary,* 785 A.2d 1123, 1126 (R.I.2001); *see*

*also Papudesu,* 18 A.3d at 497; *Tavares ex rel. Guiterrez v. Barbour,* 790 A.2d 1110, 1112 (R.I.2002).

It should be noted, however, that it is also well established that, in deciding whether or not summary judgment should be granted, it must at all times be borne in mind that "[t]he purpose of the summary-judgment procedure is to identify disputed issues of fact necessitating trial, not to resolve such issues." *Rotelli v. Catanzaro,* 686 A.2d 91, 93 (R.I.1996); *see also Estate of Giuliano,* 949 A.2d at 391; *Steinberg v. State,* 427 A.2d 338, 340 (R.I.1981). Accordingly, we have stated that "[w]hen a genuine issue of fact exists * * * the trial justice must not decide the issue," and summary judgment will not be an appropriate remedy. *Gliottone v. Ethier,* 870 A.2d 1022, 1027 (R.I.2005) (internal quotation marks omitted); *see also Estate of Giuliano,* 949 A.2d at 391 ("It is important to bear in mind that the 'purpose of the summary judgment procedure is issue finding, not issue determination.'") (quoting *Industrial National Bank v. Peloso,* 121 R.I. 305, 307, 397 A.2d 1312, 1313 (1979)).

## III

### Analysis

On appeal, Arbella contends that the hearing justice erred in granting summary judgment because she improperly "assumed" that, because the Destremps alleged that they first discovered flooding damage to their property at a point in time before Employers began to insure Viking Stone in 2004, "the flooding was caused by the conduct of Viking and * * * all subsequent water related incidents for liability insurance purposes constituted a single continuous occurrence caused or set in motion by Viking." It is Arbella's contention that, because there was conflicting evi-

dence before the court with respect to whether the flooding was caused by Viking Stone and, if so, whether the flooding constituted a single occurrence or multiple occurrences, the hearing justice erred in finding as a matter of law that the incidents that gave rise to the Destremps' claim constituted a single occurrence beginning before the Employers' policy period such that its coverage could not be triggered. We agree.

In the instant case, it is clear to us that there are genuine issues of material fact which precluded the determination as a matter of law that the flooding damage to the Destremps' property that allegedly began prior to the initiation of the Employers policy period was "an accident, including continuous or repeated exposure to substantially the same general harmful conditions"[4] and therefore constituted a single occurrence as defined in the policy—rather than multiple separate occurrences which would raise the possibility of coverage under the Employers policy.

There was also a dispute with respect to whether the Destremps' property was in fact "flooded" by water flowing from the Viking Stone property onto their property—let alone whether such flooding constituted a single occurrence or multiple occurrences. Although the Destremps alleged in their complaint that Viking Stone and Mr. Mello had "caused water containing contaminants from the quarry operation to cross over and under Fish Road from their respective properties and onto the Destremps' property," Mr. Mello in his deposition testimony averred that he did not believe that water had *ever* leached under Fish Road, and he also stated that he had seen only clear and stagnant water on the Destremps' property, rather than silty and/or flowing water.

Counsel for Arbella observed that the water could be coming up from underneath the Destremps' property rather than flowing onto the Destremps' property. Further, although Mr. Destremps stated in his affidavit that the "water from the depression on Viking [S]tone's property continually leeches into our property," Mr. Mello in his deposition testimony averred that the property where water collected on the same side of Fish Road as where his quarry operated was in fact owned by the Town of Tiverton, not Viking Stone, raising another important issue of fact.

The Destremps also alleged in their memorandum in support of their motion for injunctive relief in the underlying civil action that Viking Stone had caused the flooding by its "deliberate act of directing its quarry water down the hill and under and over Fish Road onto the plaintiffs' property;" and, in his affidavit, Mr. Destremps stated that there were "large ponds or pools of water" on top of the hill where the quarry operated, and he also stated that he had observed a Viking Stone backhoe opening an earthen dam "to cause water to run down the hill * * *." By contrast, Mr. Mello explicitly denied in his deposition testimony that there were any "ponds or depressions where water collects up on the top of the hill," and he stated that any water that flowed down the hill was a natural phenomenon and was not the result of any active direction of the water by Viking Stone. Mr. Mello also denied in strong language that he or any other Viking Stone backhoe operator had made any openings in an earthen berm on top of the hill.

In addition to the factual dispute with respect to whether any "flooding" of water coming from the Viking Stone property

---

**4.** The language quoted in the text is from the definition of an "occurrence" that is contained in both Employers' and Arbella's commercial general liability policies.

onto the Destremps' property had in fact ever occurred, there was also a dispute with respect to whether the alleged flooding that began at some time between 2001 and 2003 and continued until at least 2008 was caused by the "continuous or repeated exposure to substantially the same general harmful conditions" such that it was a single occurrence for the purposes of insurance coverage. Employers argues that the cause of the flooding damage was "Viking's continuous pattern and practice of causing water to flow onto the plaintiff's property;" and it notes that the hearing justice determined that the definition of an "occurrence" constrained her to find that the facts alleged in the Destremps' complaint could not be "anything but one occurrence."

In our view, however, there was not sufficient undisputed evidence upon which to base the conclusion that the flooding was the result of "a continuous pattern and practice" of Viking Stone or that the flooding fell within the meaning of the term "occurrence" as defined in Employers' insurance policy.

We first note that, with respect to the nature of the flooding, the Destremps' complaint alleged that Viking Stone began its quarry operation in 2001 and that, "[o]ver the years since then, Viking Stone and defendant Frank Mello have caused water containing contaminants from the quarry operation to cross over and under Fish Road from their respective properties and onto the Destremps' property." (Emphasis added.) The complaint also alleged that "water from Viking Stone's quarry operation [from] time to time has flooded Fish Road * * *." (Emphasis added.) Further, in the Destremps' answers to Viking Stone's interrogatories, they stated that the flooding had happened "[o]n numerous occasion[s] over the past five years," and in his affidavit Mr. Destremps

stated that "since Viking Stone took over in 2002 we have experienced continual flooding * * *." (Emphasis added.) Mr. Destremps also stated in his affidavit that he and his wife had "observed on several occasions a Viking Stone backhoe opening [an] earthen dam" and causing water to run down the hill and eventually flood his property. (Emphasis added.)

In our judgment, the phrases "over the years since then," "[from] time to time," "[o]n numerous occasion[s]," and "several occasions" do not convey the sense that the alleged flooding constituted the "continuous or repeated exposure to substantially the same general harmful conditions" such that it could be determined as a matter of law that the alleged flooding damage was the result of one occurrence.

Further adding to the uncertainty as to whether the flooding constituted one occurrence or multiple occurrences is the fact that in their submissions to the Superior Court and to this Court the parties have used the words "continuous" and "continual" in a rather interchangeable manner to describe the flooding that the Destremps allege to have experienced on their property, and yet those adjectives have quite different definitions. Employers argued (and the hearing justice agreed) that the alleged flooding was "one occurrence" due to the fact that it resulted from what Employers called Viking Stone's "continuous pattern and practice," which Employers described as "one, proximate, uninterrupted, continuous cause resulting in the underlying plaintiff's damages." However, the affidavit submitted by Mr. Destremps in the underlying civil action used only the words "continual" and "continually;" at no point in the affidavit does he use the adjective "continuous."

"Continuous" has been defined as "[u]ninterrupted in time, sequence, substance, or extent," whereas "continual" has been

defined as "[r]ecurring regularly or frequently." American Heritage Dictionary of the English Language 397, 398 (4th ed.2009).

On the basis of what was presented to the hearing justice, it could rationally be concluded that flooding events alleged to have taken place "[o]n numerous occasion[s]" over the course of five years, or that were "continual," could be the result of multiple, discrete occurrences *rather than* one occurrence—which occurrence, Employers alleged, was constituted of an uninterrupted pattern and practice on the part of Viking Stone. The facts as alleged do not permit an unequivocal conclusion that the flooding constituted "continuous or repeated exposure to substantially the same general harmful conditions"—because, again, there is an issue of material fact with respect to whether the flooding, even if it was caused by one or more of the defendants in the underlying civil action, was the result of separate and distinct acts by one or more of those defendants, rather than being the result of a single pattern and practice that resulted in the requisite "continuous or repeated exposure."

Employers argues on appeal that what it characterizes as the "alleged continuous discharge" of water as a result of Viking Stone's actions "is claimed to have resulted in the continual flooding of the Destremps' property" and that, even if there were multiple injuries—*i.e.,* instances of flooding damage to the Destremps property— which extended over a period of time, that does not change the fact that there was a single occurrence, as long as there was one proximate cause of the injuries. In support of its argument, Employers asserts that this Court has held "that the dissemination of contaminants, through seepage, constitutes a continuous or repeated exposure to conditions resulting in property damage," citing the case of *Avco Corp. v.*

*Aetna Casualty & Surety Co.,* 679 A.2d 323, 328 (R.I.1996). In that case, it had been asserted that the plaintiff engine manufacturing corporation was responsible for allowing contaminants to seep into ground water in the area surrounding its manufacturing plant over a number of years. *Id.* at 324–25. Government testing concluded that the manufacturing plant was the source of the contamination, that the seepage of chemicals into the ground had taken place at least since the 1930s, and that solvents and acids used in the manufacturing process had leaked or spilled onto the plant's floors and seeped into the plant's sewer system. *Id.* at 324, 325 n. 1. The manufacturer had also admitted in a consent order that it had discharged contaminants into surrounding ground water. *Id.* at 325.

The Court in *Avco,* 679 A.2d at 328, did state summarily that "[t]he contaminants that were released or that seeped into the ground for an undetermined number of years assuredly may be characterized under the applicable policy language as representing a 'continuous' or 'repeated' exposure to conditions that caused injury to property." However, the *Avco* case is readily distinguishable from the case at bar. First, we note that the Court in that case upheld the grant of summary judgment in favor of the defendant insurance carriers because it determined that there was no issue of material fact with respect to whether the manufacturer had not provided the proper notice to various insurers of the claims against it as required by the provisions of the relevant insurance policies, and the Court determined that the trial court had properly found as a matter of law that the insurers were prejudiced as a result. *Id.* at 330. The Court was not called upon to specifically address the issue of whether the seepage constituted a single, as opposed to multiple, occurrence for the purposes of insurance coverage—

rather, it stated that the seepage was an occurrence such that the manufacturing corporation had been obligated to notify its insurers based on policy language which reads as follows: "Upon the happening of an occurrence, written notice shall be given * * * to the company * * * *as soon as practicable.*" *Id.* at 327. Further, in *Avco* there was no contention made that the seepage possibly resulted from separate, distinct acts rather than from a single pattern and practice, nor was there a contention that the seepage did not in fact result from any acts on the part of the manufacturer—rather, a study had already determined that seepage from the plant had been taking place since at least the 1930s, and the manufacturer admitted that it had caused the seepage by its actions. By contrast, in the instant case, it is contested whether the alleged flooding resulted from actions taken by Viking Stone—and, even if it did, it is not at all clear whether Viking Stone's actions caused a continuous and repeated exposure to substantially the same general harmful conditions over a number of years, as opposed to being distinct types of actions giving rise to separate instances of flooding.

As indicated in this opinion, the record discloses the presence of several material disagreements relative to what occurred from the time that the Viking Stone quarrying operation began in or about 2001. In view of the presence of such genuine issues of material fact, we conclude that summary judgment was improperly granted. *See* Rule 56(c) of the Superior Court Rules of Civil Procedure.

### IV

### Conclusion

For the reasons set forth in this opinion, we vacate the Superior Court's entry of partial summary judgment in favor of the plaintiff, Employers Mutual Casualty Company. The record in this case may be remanded to that tribunal.