NV One, LLC, et al.                    :

v.                    :

Potomac Realty Capital, LLC, et al.          :

NOTICE:    This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

|  |  |
|---|---|
| NV One, LLC, et al. | : |
| v. | : |
| Potomac Realty Capital, LLC, et al. | : |

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**O P I N I O N**

**Chief Justice Suttell, for the Court.** In a case of first impression, we are asked to determine whether a usury savings clause in a commercial loan document validates an otherwise usurious contract. In view of the facts and circumstances of this case, we conclude that it does not; we hold, therefore, that the promissory note at issue is void as a matter of law.

The defendant, Potomac Realty Capital, LLC, (PRC or defendant) appeals from the Superior Court's grant of partial summary judgment in favor of plaintiffs, NV One, LLC, Nicholas E. Cambio, and Vincent A. Cambio (collectively, NV One or plaintiffs). The defendant asserts that the trial justice erred when he granted plaintiffs' motion for partial summary judgment on liability for violation of the usury statute, G.L. 1956 § 6-26-2, by declaring the usury savings clause of the parties' loan agreement unenforceable. For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

- 1 -

# I

## Facts and Procedural History[1]

In 2007, plaintiffs sought a loan to rehabilitate and renovate a former post office located at 1190 Main Street in the Town of West Warwick (property). On July 17, 2007, NV One entered into a loan agreement with PRC and signed a promissory note (note) for the principal amount of $1,800,000; as security for the loan, NV One granted a mortgage, assignment of leases and rents, security agreement, and fixture filing with respect to the property. The plaintiffs Nicholas E. Cambio and Vincent A. Cambio also personally guaranteed the loan.

In addition to the note, mortgage, and related documents, at the closing of the loan the parties executed a Sources and Uses of Funds sheet and a Loan Disbursement Authorization (all collectively, the loan documents). The loan documents established both an "interest reserve" and a "renovation reserve," set initially at $62,500 and $940,000, respectively. Monthly interest-only payments were due on the first day of each calendar month until the loan's maturity date of August 1, 2008, on which date final payment of both the unpaid interest and unpaid principal was to be made. The note set an interest rate at "the greater of 5.3% or the LIBOR Rate, plus 4.7%."[2] The note also set a "default rate" at "the lesser of (a) twenty-four percent (24%) per annum and (b) the maximum rate of interest, if any, which may be collected * * * under applicable law." The loan documents also imposed fees, including an exit fee of $18,000 and an

---

[1] Only a portion of the record was certified to this Court. The facts, which are not disputed, are gleaned largely from the trial justice's written decision. The trial justice relied almost exclusively on the complaint and the August 17, 2011 affidavit of Nicholas E. Cambio and the exhibits attached thereto.

[2] LIBOR, which stands for "London Interbank Offered Rate," is defined as "[a] daily compilation by the British Bankers Association of the rates that major international banks charge each other for large-volume, short-term loans of Eurodollars, with monthly maturity rates calculated out to one year." Black's Law Dictionary 1027 (9th ed. 2009).

origination fee of $25,000. The Sources and Uses of Funds sheet also notes a previous deposit of $15,000, raising the total value of the loan to $1,815,000.

At the heart of this case are the maximum interest provisions contained in both the note and the mortgage; as the trial justice noted in his decision, "[t]hese provisions attempt to conform the instruments to the local usury laws, and they are commonly known as usury savings clauses." Section 4.4 of the note, titled "Maximum Amount," provides a usury savings clause, which reads in pertinent part:

> "A. It is the intention of Maker [NV One] and Payee [PRC] to conform strictly to the usury and similar laws relating to interest from time to time in force, and all agreements between Maker and Payee, whether now existing or hereafter arising and whether oral or written, are hereby expressly limited so that in no contingency or event whatsoever, whether by acceleration of maturity hereof or otherwise, shall the amount paid or agreed to be paid in the aggregate to Payee as interest hereunder or under the other Loan Documents or in any other security agreement given to secure the Loan Amount, or in any other document evidencing, securing or pertaining to the Loan Amount, exceed the maximum amount permissible under applicable usury or such other laws (the 'Maximum Amount').
> "B. If under any circumstances Payee shall ever receive an amount that would exceed the Maximum Amount, such amount shall be deemed a payment in reduction of the Loan owing hereunder and any obligation of Maker in favor of Payee * * * or if such excessive interest exceeds the unpaid balance of the Loan and any other obligation of Maker in favor of Payee, the excess shall be deemed to have been a payment made by mistake and shall be refunded to Maker."

Although the parties executed the loan documents, the entire $1.8 million principal balance was not disbursed at the closing of the loan, nor was it ever fully disbursed to NV One. The trial justice attributed this, in part, to the holdbacks for the $940,000 renovation reserve and the $62,500 interest reserve.[3] Although the loan documents required both reserves to be placed

---

[3] The interest reserve was increased from $62,500 to $63,000 on September 1, 2007.

in escrow, PRC never actually placed funds in escrow, nor did it segregate the funds in any way. Critically, section 2.12 of the note provided that NV One would not accrue any interest on the reserved funds.

At the time of closing there was a net funding disbursement of $761,478.54; and, in January 2008, a disbursement of $143,877.50 was made from the renovation reserve at the request of NV One.

The note contained a provision in section 2.7 allowing the parties to extend the date of maturity for up to an additional twelve months, provided certain conditions were met. Pursuant to that provision, on August 1, 2008, NV One paid PRC $18,000 in consideration for the execution of an allonge,[4] which extended the maturity date by ten months to June 1, 2009. The $18,000 and the interest payments on the allonge were paid out of the interest reserve. By September 2008, NV One had received $995,997.50 of the $1.8 million loan. By November 2008, the interest reserve was exhausted. By the new date of maturity, NV One received, at most, $1,007,390.52 on the $1.8 million loan.

Although PRC never disbursed the entire $1.8 million loan amount, it routinely charged NV One interest for the entire loan amount. In his decision, the trial justice noted that "[p]rior to the allonge, PRC charged interest at ten percent (10%) of the total $1.8 million, when as little as $761,478.54 was disbursed." From the time of the execution of the allonge in August 2008 through February 2009, "PRC charged NV One interest at a rate of twelve percent (12%) of the total $1.8 million, despite the fact that at its height, $1,007,390.52 was actually disbursed to NV

---

[4] Although the document itself is titled "Allonge to Note" and is referenced by the trial justice and the parties as such, "allonge" appears to be a misnomer. Black's Law Dictionary defines "allonge" as "[a] slip of paper sometimes attached to a negotiable instrument for the purpose of receiving further indorsements when the original paper is filled with indorsements." Black's Law Dictionary 88 (9th ed. 2009).

One." On February 23, 2009, PRC sent NV One a notice of default for failing to complete renovations within the time provided in the security agreement, and provided a thirty-day cure period, after which it would impose the default interest rate. In March 2009, at the end of the thirty days, "PRC charged NV One the [d]efault rate of twenty-four percent (24%) interest calculated upon the $1.8 million face amount of the [n]ote." The trial justice found that "[w]hen the interest charged is applied in the context of the amount actually disbursed, the rate exceeds twenty-one percent (21%) essentially throughout the loan." The trial justice further found that "PRC never adjusted the amount of interest charged to lower it below twenty-one percent (21%)."

Due to NV One's alleged failure to pay off the loan by the maturity date of June 1, 2009, on October 9, 2009, PRC sent NV One a notice of default and payment demand. On November 5, 2009, pursuant to its rights under the mortgage, PRC sent a foreclosure notice to NV One.[5] In addition, on or about November 19, 2009, PRC sent a demand notice to plaintiffs Nicholas E. Cambio and Vincent A. Cambio demanding payment pursuant to their personal guarantees. On December 14, 2009, plaintiffs filed a verified complaint against PRC claiming fraud, breach of contract, and usury, and seeking injunctive relief preventing foreclosure on the property and collection from the personal guarantors.[6] On August 16, 2011, plaintiffs filed a motion for summary judgment with respect to liability on count 3 of the complaint, alleging violations of the Rhode Island usury law.[7]

---

[5] Neither of these letters are contained in the record certified to this Court nor are they contained in either party's appendices.
[6] The plaintiffs subsequently amended the complaint on December 22, 2009, and April 26, 2010.
[7] General Laws 1956 § 6-26-2.

On December 16, 2011, the trial justice filed a written decision granting plaintiffs' motion for partial summary judgment. On January 11, 2012, the trial justice entered an order[8] declaring the loan usurious and void, voiding the mortgage, and removing the liens on the property from the land records. In his written decision, the trial justice found that "[i]t is clear on the record of undisputed facts that the rate was undoubtedly usurious, at least for some period." In reaching that decision, the trial justice stated that the Rhode Island usury statute generally sets the maximum allowable rate of interest at 21 percent. He further noted that "[t]o determine whether an interest rate is usurious, the value for computing the maximum permissible interest is not the amount on the face of the loan, but, rather, the actual amount received by the borrower." He then analyzed the interest rates PRC charged during each period of the loan (10 percent, 12 percent, and 24 percent) and determined that, because these percentages were calculated using the entire $1.8 million loan amount—as opposed to the $1,007,390.52 PRC actually distributed to NV One—"[t]here can be no doubt that these interest amounts charged exceeded twenty-one percent (21%) of the disbursed loan."

The trial justice next considered the applicability of the usury savings clause "in light of the public policy, legislative intent, and plain meaning of the Rhode Island usury law." The trial justice embarked on an extensive analysis of the policies behind Rhode Island usury jurisprudence, as well as the law in states with substantially developed usury law, such as Texas, Florida, and North Carolina. In ultimately declining to honor the usury savings clause and granting plaintiffs' motion for partial summary judgment, the trial justice stated that "[l]ending effect to a usury savings clause would contradict this state's articulated public policy in favor of the borrower and against usurious transactions."

---

[8] The order was not contained in the record certified to this Court.

The defendant timely appealed the January 11, 2012 order. The trial justice then stayed his ruling for forty-five days and, after a February 17, 2012 meeting with the parties' attorneys, issued a further stay pending consideration of the motion by this Court. The motion to stay came before this Court on March 14, 2012, after which this Court vacated the trial justice's stay but enjoined plaintiffs from alienating the property without prior authorization from this Court.

On appeal, PRC does not challenge the factual findings of the trial justice; rather it contends that the trial justice "erred when [he] granted [NV One's] motion for partial summary judgment on liability for violation of [G.L. 1956] § 6-26-2 by declaring the usury savings clause of the loan agreement unenforceable." The enforceability of usury savings clauses is an issue of first impression before this Court, and PRC argues that such clauses should be enforceable under Rhode Island law. In its reply brief, PRC maintains that the trial justice "erred in failing to perform a proper analysis when it rendered a commercial contract term unenforceable on the grounds of public policy."

## II

### Standard of Review

"This Court reviews the grant of summary judgment 'de novo, employing the same standards and rules used by the hearing justice.'" Carreiro v. Tobin, 66 A.3d 820, 822 (R.I. 2013) (quoting Great American E & S Insurance Co. v. End Zone Pub & Grill of Narragansett, Inc., 45 A.3d 571, 574 (R.I. 2012)). "[S]ummary judgment is a drastic remedy, and a motion for summary judgment should be dealt with cautiously." Id. (quoting Employers Mutual Casualty Co. v. Arbella Protection Insurance Co., 24 A.3d 544, 553 (R.I. 2011)). This Court "will affirm a lower court's decision only if, after reviewing the admissible evidence in the light most favorable to the nonmoving party, we conclude that no genuine issue of material fact exists and

- 7 -

that the moving party is entitled to judgment as a matter of law." Id. (quoting Great American E & S Insurance Co., 45 A.3d at 574).

## III

## Discussion

Liability for usurious interest rates in Rhode Island is well settled and clear. The maximum allowable interest rate is a statutory construct whereby interest rates in excess of 21 percent per annum are deemed usurious. Section 6-26-2(a). Contracts in violation of § 6-26-2 are usurious and void, and the borrower is entitled to recover any amount paid on the loan. Section 6-26-4. The lender's subjective intent to comply with the usury laws is immaterial. Burdon v. Unrath, 47 R.I. 227, 231, 132 A. 728, 730 (1926). In order to determine whether an interest rate is usurious, the face amount of the loan is irrelevant; instead, the maximum allowable interest is calculated based on the amount actually received by the borrower. See Industrial National Bank of Rhode Island v. Stuard, 113 R.I. 124, 125, 318 A.2d 452, 453 (1974). Because neither party disputes the material facts, i.e., that PRC charged NV One interest in excess of the permissible 21 percent maximum,[9] the applicability of the usury savings clause is determinative of whether NV One is entitled to judgment as a matter of law.

### PRC's Usurious Interest Rate

Setting aside for the moment the usury savings clause, it is abundantly clear to this Court that the loan between PRC and NV One was usurious. However, because only a portion of the record was certified to this Court and the numbers contained therein are undisputed, we will not belabor the analysis any more than is necessary to determine usury. According to PRC's Loan

---

[9] Despite the fact that the parties agree that the interest rates were usurious, this Court reviews grants of summary judgment de novo, and we will review the numbers to either confirm or deny the usury violation.

Activity Report, from the inception of the loan on July 17, 2007, through August 31, 2007, PRC disbursed only $797,500 of the entire $1.8 million loan amount. In accordance with the Sources and Uses sheet of the loan document, the $62,500 interest reserve and the $940,000 renovation reserve—which constitute the balance of the loan—were required to be placed in escrow by PRC. However, according to Nicholas E. Cambio's sworn affidavit, these funds were not placed in escrow, but were merely established as "journal entries" by PRC. Nevertheless, PRC charged NV One interest at a rate of 10.125 percent for August 2007, calculated against the entire $1.8 million loan amount, for a total interest charge of $15,693.75.

The fact that PRC calculated the interest amount against the face amount of the loan as opposed to the amount of the disbursed funds is of critical importance to the usury determination. See Industrial National Bank of Rhode Island, 113 R.I. at 125, 318 A.2d at 453. For instance, the August interest charge, when calculated against the actual disbursed amount, as is necessary to determine usury, results in an effective interest rate of 23.17 percent per annum.[10] Because PRC and NV One entered into a valid loan contract, and the 23.17 percent interest rate that PRC charged exceeds the 21 percent maximum interest rate set out in § 6-26-2, it is clear to us that the loan was usurious and therefore void.[11]

However, one need not engage in complex arithmetic in order to discern usury in PRC's loan. In the event of default by NV One, the note imposed a default interest rate at "the lesser of (a) twenty-four percent (24%) per annum and (b) the maximum rate of interest, if any, which

---

[10] The $15,693.75 averages out to $506.25 per day in interest charges, and a total of $184,781.25 per year. In order to generate $184,781.25 in annual interest on a $797,500 loan (the actual disbursed amount), interest must be charged at a rate of 23.17 percent.

[11] It bears mentioning that during the entire life of the loan PRC routinely calculated interest against the $1.8 million amount, despite the fact that the most that PRC ever disbursed to NV One was $1,007,390.52. Thus, the actual interest rate was in excess of 21 percent for the majority of the loan.

may be collected * * * under applicable law." This 24 percent interest rate is usurious on its face. See § 6-26-2. Moreover, during the default period, PRC did not attempt to conform the charged interest to the maximum rate allowable by law (21 percent), but instead demanded the full 24 percent. The following sequence of events is illustrative. On February 23, 2009, PRC sent NV One a notice of default,[12] providing NV One with thirty days to cure the default before PRC would impose the default interest rate. On April 8, 2009, PRC sent another letter[13] indicating that NV One had defaulted and PRC would be imposing the default interest rate, retroactive to March 24, 2009. Finally, on November 19, 2009, PRC sent the Cambios a demand for payment pursuant to their personal guarantee, demanding full payment of the $1,007,390.52, plus an additional $464,487.62 in back interest and fees. The back interest PRC demanded—$382,800—consists partly of $296,800 in interest charged during the default period of March 24, 2009, through November 17, 2009. PRC calculated this latter figure by applying the default 24 percent rate to the $1.8 million face value of the loan. The 24 percent rate is facially usurious irrespective of the loan amount; however, when calculated against the actual disbursed amount, that rate skyrockets to 43.48 percent per annum,[14] more than double the maximum permissible interest rate. Therefore, it is apparent to this Court that not only did PRC charge a usurious interest rate, but it made no attempt to lower the interest charges to conform to the maximum permissible interest rate.

---

[12] This notice is not contained in the record certified to this Court.

[13] Once again, not in the record.

[14] PRC charged the default rate of 24 percent for the 239 days of the default period from March 24, 2009, through November 17, 2009, for an interest charge of $1,200 per day. $1,200 per day amounts to $438,000 annually, which, when calculated against the $1,007,390.52 disbursed amount, results in an annualized interest rate of 43.48 percent.

- 10 -

## The Usury Savings Clause

Having determined that the loan is usurious, we turn now to the applicability of the usury savings clause.[15] It is well settled in Rhode Island that "a contract term is unenforceable only if it violates public policy." Gorman v. St. Raphael Academy, 853 A.2d 28, 39 (R.I. 2004). A contract, or a term contained therein violates public policy only if it is: "[1] injurious to the interests of the public, [2] interferes with the public welfare or safety, [3] is unconscionable; or [4] tends to injustice or oppression." Id. (quoting City of Warwick v. Boeng Corp., 472 A.2d 1214, 1218 (R.I. 1984)). In order to decide whether the enforcement of a usury savings clause violates public policy, we must first determine the public policy underlying the usury laws in general. Although some states' statutes explicitly articulate the policy behind their usury laws,[16] the Rhode Island usury statutory scheme is relatively brief and makes no mention of public policy or legislative intent. See chapter 26 of title 6. It is therefore incumbent upon this Court to discern the public policy undergirding the usury laws. To that end, we begin by first examining the plain language of the statute.

The pertinent language of the Rhode Island usury statute states, without qualification, that "no person, partnership, association, or corporation loaning money * * * shall, directly or indirectly, reserve, charge, or take interest on a loan, whether before or after maturity, at a rate

---

[15] We begin this analysis by rejecting PRC's contention that the case should be remanded because the trial justice "erred in failing to perform a proper analysis when [he] rendered [the usury savings clause] unenforceable on the grounds of public policy." Because this Court reviews grants of summary judgment de novo, whether or not the trial justice failed to conduct a proper analysis with regard to the usury savings clause has no bearing on PRC's appeal. See Carreiro v. Tobin, 66 A.3d 820, 822 (R.I. 2013).

[16] See, e.g., N.C. Gen. Stat. Ann. § 24-2.1(g) (West 2007) ("It is the paramount public policy of North Carolina to protect North Carolina resident borrowers through the application of North Carolina interest laws."); Wash. Rev. Code Ann. § 19.52.005. (West 1999) ("[The usury statutes] are enacted in order to protect the residents of this state from debts bearing burdensome interest rates; * * * and in recognition of the duty to protect our citizens from oppression generally.").

which shall exceed * * * twenty-one percent (21%) per annum * * * ." Section 6-26-2(a). The use of the word "shall" evinces a certainty; in other words, a lender that charges interest in excess of 21 percent is liable for usury. Additionally, the fact that the Legislature explicitly delineated only one specific exception[17] to the maximum interest rate indicates a consideration (and rejection) of any and all other circumstances whereby a lender may charge interest in excess of 21 percent. The criminal usury statute, § 6-26-3 criminalizes "willful[] and knowing[]" violations of the maximum interest rate, thereby further underscoring the immateriality of a lender's intent in determining civil usury under § 6-26-2. Because the lender's intent to charge an interest rate exceeding the permissible maximum is immaterial to a determination of usury (and the invocation of penalties resulting therefrom), it is clear that the Legislature intended an inflexible, hardline approach to usury that is tantamount to strict liability.[18]

This rigid approach is borne out in the historically strict enforcement of the statute and its predecessors through the years. In a 1926 decision concerning a prior usury statute, this Court rejected a lender's argument that he had intended to abide by the maximum interest limits, holding that lack of intent "is no excuse for the violation of the statute." Burdon, 47 R.I. at 231, 132 A. at 730. The Court stated that "[t]o hold otherwise would violate an established principle of law, and would furnish to avaricious lenders a convenient excuse for an evasion of the law." Id. Three years later, the Court once again denied a lender's contention that his lack of intent to violate the statute should alleviate his liability for usury. Colonial Plan Co. v. Tartaglione, 50 R.I. 342, 344, 147 A. 880, 881 (1929). The Court rejected the notion that a borrower can

---

[17] See § 6-26-2(e) (no limit on interest rate for a commercial borrower, over $1,000,000, where loan is not secured against principal residence of the borrower, and pro forma analysis by a certified CPA indicates that loan is capable of being repaid).

[18] We are not confronted in this case with a good faith bookkeeping error, be it human or electronic.

contract with a lender to pay more than the permissible interest rate because "[t]o permit it would open the door to the very abuses and opportunities to take advantage of small borrowers which the statute is designed to prevent." Id. In 1951, this Court, in upholding the recovery of both interest and principal payments by an aggrieved borrower remarked that "[p]lainly the policy of the legislature was to provide severe penalties against the lender for his violation of the statute as the best method in its judgment to prevent usurious transactions." Nazarian v. Lincoln Finance Corp., 77 R.I. 497, 505, 78 A.2d 7, 10 (1951). In what was seemingly a note of caution to future lenders, the Court warned that "[i]f the result seems harsh the penalty can be avoided easily by writing loan agreements that exact no more than the law allows." Id. Although these cases concern prior iterations of the usury statute, the underlying policy consistent throughout the decisions is readily apparent: Usurious interest rates are to be avoided at all costs and the onus is on the lender to ensure compliance with the maximum rate of interest.

The strict policy against usurious transactions has continued in the case law concerning the current usury statute. In a 1982 decision permitting a debtor to waive the defense of usury, this Court acknowledged a "clear legislative intent to provide severe penalties against lenders who violate the usury laws," and noted that the usury statutes clearly manifest "[a] strong public policy against usurious transactions." DeFusco v. Giorgio, 440 A.2d 727, 732 (R.I. 1982).

Although not binding on this Court, two decisions from the U.S. District Court for the District of Rhode Island concerning usury in the context of bankruptcy proceedings are illustrative of the public policy underlying the usury statute. In declining to apply the in pari delicto doctrine against a borrower of a usurious loan, the district court judge, citing § 6-26-2, found that "Rhode Island usury law places the burden of charging a legal interest rate on the lender." Sheehan v. Richardson, 315 B.R. 226, 240 (Bankr. D. R.I. 2004), aff'd, 185 F.App'x 11

(1st Cir. 2006). The judge further rejected the notion that the borrower agreeing to the terms of the loan absolves the lender from liability for usurious interest rates, stating that "[d]espite mutual assent to the terms, Rhode Island statutes do not punish the borrower." Id. at 241. Yet perhaps the most telling reflection of the rigidity of the usury statute is the Bankruptcy Court's decision in In re Swartz, where the court found that a $4 filing fee—which accounted for the only interest in excess of the maximum interest rate—rendered the entire loan usurious. In re Swartz, 37 B.R. 776, 779 (Bankr. D. R.I. 1984). The "[d]raconian tenor" of the statute, the judge noted, is "intended to protect borrowers from hidden and pernicious interest charges, and places total responsibility upon the lender for strict compliance." Id. at 779 & n.5. The judge continued: "To allow a lender who has collected or retained fees in excess of the legal limit to plead 'innocent mistake' after discovery of the overcharge by the debtor, would surely invite precisely the kind of abuse which the statute is designed to prevent." Id. at 779.

In our opinion, the analyses of the Bankruptcy Court, as well as the prior opinions of this Court accurately and convincingly evince the public policy behind the usury statute: For protection of the borrower, it is incumbent upon the lender to ensure full compliance with the provisions for maximum rate of interest, and, apart from the explicit exception in § 6-26-2(e), anything short of full compliance renders the transaction usurious and void.

PRC argues that because the two parties are "sophisticated business entities," they should be bound by the usury savings clause to which they agreed, and that allowing NV One to void the loan would not further public policy. In support, PRC offers a series of statutes from foreign jurisdictions, all of which foreclose corporations from asserting usury as a defense. While most corporations may indeed be better able to protect themselves from avaricious lenders than other less sophisticated borrowers, PRC's argument entirely misses the mark. The Rhode Island usury

- 14 -

statute not only contemplated lender/borrower relationships between commercial business entities, but provided a statutory exception to usury for that very situation. That exception to the maximum rate of interest is laid out in § 6-26-2(e), which provides:

> "Notwithstanding the provisions of subsection (a) of this section and/or any other provision in this chapter to the contrary, there is no limitation on the rate of interest which may be legally charged for the loan to, or use of money by, a commercial entity, where the amount of money loaned exceeds the sum of one million dollars ($1,000,000) and where repayment of the loan is not secured by a mortgage against the principal residence of any borrower; provided, that the commercial entity has first obtained a pro forma methods analysis performed by a certified public accountant licensed in the state of Rhode Island indicating that the loan is capable of being repaid."

By its plain language, this allows a lender to charge any interest rate it pleases without the possibility of a usury violation, provided that certain conditions are met in advance of the loan.[19] There is a binary dynamic implicit in the usury statute whereby a lender is either bound by the maximum interest provision and all its constituent penalties, or it is completely free from them. In our opinion, the very existence of this exception underscores the policies of borrower protection and lender accountability ingrained in the usury statute and its companion case law by recognizing that some borrowers are different, and thus not entitled to the statute's "drastic" protections. See Colonial Plan Co., 50 R.I. at 345, 147 A. at 881.

With these underlying public policies in mind, we turn next to the applicability of savings clauses in general. In our view, the enforcement of usury savings clauses would entirely obviate any responsibility on the part of the lender to abide by the usury statute, and would, in essence, swallow the rule. As articulated supra, there is a strong public policy against usurious

---

[19] It bears mentioning that, because the two parties are commercial entities, the loan exceeded $1,000,000, and was not secured by either of the Cambios' primary residences, the loan at issue surely qualified for the exception. By not securing the requisite pro forma analysis, PRC failed to avail itself of the exception and is therefore bound by the maximum interest rate.

- 15 -

transactions, with lenders—typically in a better position to understand the terms of the loan—bearing the burden of compliance. See DeFusco, 440 A.2d at 732. If lenders could circumvent the maximum interest rate by including a boilerplate usury savings clause, lenders could charge excessive rates without recourse. This would have the reverse effect of incentivizing lenders to attempt to charge excessive interest rates because, at worst, the lender could invoke the savings clause and the interest rate would simply be reduced to the highest acceptable rate without any penalty to the lender. There is no doubt that such a mechanism runs completely afoul of the clear public policy against usurious transactions.

In addition to incentivizing usurious interest rates, giving effect to usury savings clauses would rest the burden of ensuring compliance squarely on the shoulders of the borrower. We firmly agree with the analysis of the Supreme Court of North Carolina, which, in declining to allow a lender to invoke a usury savings clause to shield itself from liability for usury, stated:

> "The [usury] statute relieves the borrower of the necessity for expertise and vigilance regarding the legality of rates he must pay. That onus is placed instead on the lender, whose business it is to lend money for profit and who is thus in a better position than the borrower to know the law. A 'usury savings clause,' if valid, would shift the onus back onto the borrower, contravening statutory policy and depriving the borrower of the benefit of the statute's protection and penalties." Swindell v. Federal National Mortgage Association, 409 S.E.2d 892, 896 (N.C. 1991).

We have no doubt that the inclusion of usury savings clauses in loan contracts would lead to results that are injurious to the money-borrowing public, as well as potentially unconscionable or tending towards injustice or oppression. See Gorman, 853 A.2d at 39. We therefore hold that, in loan contracts such as the instant loan, usury savings clauses are unenforceable as against the well-established public policy of preventing usurious transactions.

Based on our <u>de novo</u> review, after viewing the evidence in the light most favorable to PRC, it is clear to this Court that the loan was a usury in violation of § 6-26-2. Furthermore, because we hold that the usury savings clause is unenforceable on public policy grounds, there are no remaining issues of material fact and NV One is entitled to judgment as a matter of law. Therefore the trial justice's grant of partial summary judgment for NV One on count 3 was proper, and we have no cause to reverse his decision.

**IV**

**Conclusion**

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court. The record shall be returned to the Superior Court.



**RHODE ISLAND SUPREME COURT CLERK'S OFFICE**

*Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**          NV One, LLC, et al. v. Potomac Realty Capital, LLC, et al.

**CASE NO:**          No. 2012-262-Appeal.
(PB 09-7159)

**COURT:**          Supreme Court

**DATE OPINION FILED:**   February 18, 2014

**JUSTICES:**          Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**          Chief Justice Paul A. Suttell

**SOURCE OF APPEAL:**     Providence County Superior Court

**JUDGE FROM LOWER COURT**:

Associate Justice Michael A. Silverstein

**ATTORNEYS ON APPEAL:**

For Plaintiff:  Richard G. Riendeau, Esq.

For Defendant:  Kurt T. Kalberer II, Esq.