**Supreme Court**

No. 2012-328-Appeal.
(PM 10-4650)

Lawrence C. LaBonte                     :
(American Steel Coatings, LLC)

                    v.                  :

New England Development R.I., LLC et al.   :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Lawrence C. LaBonte          :
(American Steel Coatings, LLC)

v.                           :

New England Development R.I., LLC et    :
al.[1]

Present:  Suttell, C.J., Goldberg, Flaherty, and Robinson JJ.

## O P I N I O N

**Justice Robinson, for the Court.**   American Steel Coatings, LLC (American Steel) appeals from a December 7, 2011[2] order, in which a justice of the Providence County Superior Court voided as usurious a "Loan Agreement, Promissory Note, and Mortgage granted to American Steel * * * by New England Development RI, LLC [(N.E. Development)]" and that entity's owner, Lawrence C. LaBonte.  American Steel contends on appeal that the hearing justice erred when he determined that the "commercial loan commitment fee" (as American Steel characterizes it) contained in the loan agreement between the parties was to be considered interest because it did not fall within the provisions of G.L. 1956 § 6-26-2(c)(1) (which details

---

[1]   We have captioned this case in the manner employed by the parties in their briefs to this Court.  The actual relationship between the parties will be explained infra.

[2]   The order was signed by the Superior Court justice on December 7, 2011, but it was not stamped by a clerk in the Superior Court until December 8, 2011.

fees that are not considered to be interest). American Steel further contends that the hearing justice also erred when he concluded that the loan agreement was not rendered non-usurious by the presence of a usury "savings clause."

For the reasons set forth in this opinion, we affirm the order of the Superior Court.

## I

## Facts and Travel [3]

On August 10, 2010, Mr. LaBonte filed a petition in Providence County Superior Court seeking "the reorganization and/or the orderly liquidation and dissolution" of N.E. Development. In that petition, American Steel was listed as the "first lien holder on the [p]roperty located at One Main Street, Scituate, Rhode Island" (the Scituate property). Thereafter, on November 23, 2010, American Steel filed a "Motion to Approve Secured Claim, Authorize Credit Bid and Approve Release of Funds"[4] (motion to approve secured claim) in an attempt to recover the funds that it alleged were owed pursuant to the loan agreement between the parties, which was dated January 8, 2010.

In the motion to approve secured claim, American Steel alleged that N.E. Development had granted it a "first position mortgage" for the Scituate property in exchange for a loan with a principal amount of $325,000; American Steel contended that it was owed a total of $412,614.54 from N.E. Development ($403,952.04 of which it claimed was due pursuant to the loan agreement).[5] New England Development's permanent receiver, Peter J. Furness, and Mr.

---

[3] We note that the facts in this case are not in dispute.

[4] Many of the filings by the parties referenced in this Court's discussion have headings which use all capital letters, are underlined, or employ bold-face type. We have conformed those headings to our usual style throughout this opinion.

[5] According to the motion to approve secured claim, the total due included the principal of the loan, accrued unpaid interest, late fees, and "reasonable attorneys' fees and expenses."

LaBonte filed objections, asserting that the loan agreement between American Steel and N.E. Development was void because the amount of interest to be charged violated Rhode Island's usury laws.[6] A hearing was conducted on June 23, 2011. We summarize below the salient aspects of what transpired at that hearing.

**A**

**The Hearing Testimony**

**1. American Steel's Witnesses**

**i.      The Testimony of John J. Vallone**

John Vallone testified that he was the attorney who represented American Steel "in connection with [the] loan to [N.E.] Development;" he stated that he prepared the promissory note from N.E. Development to American Steel, as well as "a loan agreement between the parties," a guarantee from Mr. LaBonte, and a "mortgage deed to secure the promissory note." He testified that the purpose of the loan was to purchase property which he termed "the Hope Mill property" located in Scituate.

Attorney Vallone further testified that he was a party to "two or three" meetings between Mr. LaBonte on the one hand and Eric Greene (who, according to the "Proof of Claim" filed by American Steel, was "the managing member" of American Steel), and Joseph Garies (who Mr. Vallone stated was Mr. LaBonte's "advisor") on the other hand.[7] Mr. Vallone testified that it was his understanding that American Steel would provide "$275,000" as a "short term loan for

---

[6]      General Laws 1956 § 6-26-2(a) sets the maximum rate of interest at "twenty-one percent (21%) per annum." See Part II.B, infra, for a more thorough discussion.

[7]      Joseph Garies testified that he was a "consultant" who "introduce[d] borrowers to lenders for different transactions." He stated that he was the "sole shareholder" of a company called "Global Consulting [Group]," which contracted with Mr. LaBonte to obtain financing to purchase the Scituate property.

30 days," to enable Mr. LaBonte to purchase the Scituate property. Mr. Vallone added that the intent of the parties was effectuated by a loan in the amount of $325,000 with an interest rate of 16 percent per annum. According to Mr. Vallone's testimony, at the maturity date, N.E. Development would pay back $325,000 plus interest, which would include a $50,000 "commercial loan commitment fee," to be split between American Steel and Mr. Garies. Mr. Vallone testified that the $50,000 would be split—$30,000 being allocated to American Steel and $20,000 being allocated to Mr. Garies.[8] It was Mr. Vallone's testimony that the borrowers on the loan was both N.E. Development "[a]nd Mr. Labonte [sic] individually."

Mr. Vallone further noted that he included a "savings clause" in the promissory note to "alleviate [his] concerns about any potential usury for the note." The promissory note was admitted as an exhibit.

## ii.     The Testimony of Lawrence LaBonte

American Steel called Lawrence LaBonte as an adverse witness. Mr. LaBonte testified to the details of the loan agreement in a manner largely consistent with Mr. Vallone's testimony.

Mr. LaBonte acknowledged that he signed the loan agreement "[b]oth individually and as a member of [N.E.] Development." He confirmed that, at the closing on January 8, 2010, $275,000 of the $325,000 loan amount was provided by American Steel. Moreover, in his testimony, he confirmed that a $50,000 fee was due at the closing to be divided between American Steel and Mr. Garies; he added that the loan agreement provided that at the closing he owed American Steel $325,000 plus "16 percent" interest. It was Mr. LaBonte's further testimony that he had not made any of the payments owed to American Steel pursuant to the loan agreement.

---

[8]     Mr. Garies testified that, as of the time of the hearing, he had not received his $20,000 fee.

## 2. Lawrence LaBonte & N.E. Development's Witnesses

### i. The Testimony of James M. Roche

James Roche testified that he was a "[s]elf-employed commercial finance specialist and a turnaround company consultant." His testimony focused on commercial loan commitment fees in general as well as the specific commitment fee at issue in the instant case. He testified that a commitment fee is generally money that is "paid at the closing," not money that is paid at a later time. He stated that a commitment fee "is basically a lender committing that they have the funds available, and by executing that commitment document, you would either pay the commitment fee with the execution of the document or you would pay it at the closing of the loan;" he added that commitment fees are "typically" a "percentage of the loan" and that "industry standards" would call for a commitment fee which was "half to one percent of the total amount financed."

It was his testimony that, in his experience, a $50,000 commitment fee on a $275,000 loan was "[u]nreasonable." He further stated that he had "[n]ever" seen "a situation where the commitment fee was paid at the time the loan was supposed to be paid off[.]"

### ii. The Testimony of Eric Greene

Mr. Greene, the "managing member" of American Steel, was the last witness to testify at the hearing. According to his testimony, his loan to N.E. Development was the first loan that he had made to anyone other than a member of his family; he stated: "Prior to this, prior to me being asked to lend Mr. Labonte [sic] some money, I have never lent any money in my life other than family." He testified that, because N.E. Development "couldn't afford to pay" the $50,000 commitment fee at the time of closing, he "allowed" it to be paid at the maturity date. When asked what he "expected to be paid back" at the maturity date, he testified as follows:

> "I expected to get back after 30 days $325,000, which included [Mr. LaBonte's] commitment to his mortgage broker [(Mr.

Garies)], which he couldn't afford to pay at the closing; and it included the commitment fee which I had extended him, the 30 days with interest. That was his design. And, plus one month's interest based upon 16 percent per * * * annual amount, which -- which would've been $329,000, $4,000 interest approximately at the time when the note was due. That's what we expected back."

It was Mr. Greene's testimony that the commitment fee was "going to reimburse [his] costs to make the loan."

**B**

**The Decision of the Hearing Justice**

After the hearing, the parties submitted post-hearing memoranda; and subsequently, on November 14, 2011, the hearing justice rendered a bench decision, in which he ruled in favor of N.E. Development and Mr. LaBonte.

The hearing justice first summarized the factual background of the case. He then pointed out that, under § 6-26-2(c)(1)(iv), "[c]ommercial loan commitment * * * fees" are not considered "interest." However, in the opinion of the hearing justice, "no good and clear definition" for the term "commercial [loan] commitment fee" could be found in Rhode Island law. He nonetheless concluded that, in this case, "what has been termed by the lender and [the operative] documents as a commitment fee is nothing more than a disguised addition to interest * * * ." Consequently, the hearing justice determined that the fee in this case did not "fit" within the provisions of § 6-26-2(c)(1)(iv) "so as not to be considered interest." He proceeded to address whether, when the commitment fee was considered interest, the loan violated the usury statute; he concluded that, although the exact interest rate in this case was "difficult to fathom," it was "not difficult for [the] Court to make an absolute determination" that the interest rate was "substantially in excess of 21 percent" regardless of how it was calculated.

Turning to the usury savings clause, the hearing justice looked to § 6-26-4(a) which provides that usurious contracts are "void." After a thorough analysis, he stated that "to give a lender the ability to nullify the policy of this state by including * * * a savings clause, would do violence to what our General Assembly has said the law ought to be and is." Accordingly, an order was issued on December 7, 2011[9] sustaining the objections of the receiver and Mr. LaBonte to American Steel's motion to approve secured claim and voiding the "Loan Agreement, Promissory Note, and Mortgage." American Steel filed a timely notice of appeal on December 20, 2011.

## II

## Analysis

### A

### Standard of Review

As we have often indicated we review "questions of statutory construction in a de novo manner." State v. Diamante, 83 A.3d 546, 548 (R.I. 2014); see also Downey v. Carcieri, 996 A.2d 1144, 1149 (R.I. 2010); Planned Environments Management Corp. v. Robert, 966 A.2d 117, 121 (R.I. 2009). It is a fundamental principle that when confronted with a statute that is "clear and unambiguous, this Court must interpret the statute literally and must give the words of the statute their plain and ordinary meanings." Accent Store Design, Inc. v. Marathon House, Inc., 674 A.2d 1223, 1226 (R.I. 1996); see also DeMarco v. Travelers Insurance Co., 26 A.3d 585, 616 (R.I. 2011); Sidell v. Sidell, 18 A.3d 499, 504 (R.I. 2011). Only when a statute is ambiguous will this Court "apply the rules of statutory construction and examine the statute in its

---

[9]     See footnote 2, supra.

- 7 -

entirety to determine the intent and purpose of the Legislature." Tarzia v. State, 44 A.3d 1245, 1252 (R.I. 2012) (internal quotation marks omitted); see also Downey, 996 A.2d at 1150.

We likewise have repeatedly stated that "whether a contract is clear and unambiguous is a question of law." Beacon Mutual Insurance Co. v. Spino Brothers, Inc., 11 A.3d 645, 648 (R.I. 2011); see also Cheaters, Inc. v. United National Insurance Co., 41 A.3d 637, 642 (R.I. 2012); Papudesu v. Medical Malpractice Joint Underwriting Association of Rhode Island, 18 A.3d 495, 497 (R.I. 2011); Irene Realty Corp. v. Travelers Property Casualty Co. of America, 973 A.2d 1118, 1122 (R.I. 2009). It is a fundamental principle that we review questions of law in a de novo manner. International Brotherhood of Police Officers, Local 569 v. City of East Providence, 989 A.2d 106, 108 (R.I. 2010); see also Bliss Mine Road Condominium Association v. Nationwide Property and Casualty Insurance Co., 11 A.3d 1078, 1083 (R.I. 2010). Consequently, we conduct a de novo review of a "trial justice's interpretation of a contract." Beacon Mutual Insurance Co., 11 A.3d at 649; see also Cheaters, Inc., 41 A.3d at 642.

**B**

**Commercial Loan Commitment Fee**

American Steel argues that the fee involved in the instant case is in fact a "commercial loan commitment fee" and, as provided for in § 6-26-2(c)(1)(iv), it should not be considered to be interest. It contends to this Court that the "underlying principle of the usury statute is to protect disadvantaged borrowers from unscrupulous lenders." We can infer from that contention that American Steel is positing that we should interpret our statutory law with respect to usury in such a way as to find that this loan agreement is not void because, in this case, the lender, and not as is more common the borrower, was the inexperienced party.

Mr. Furness, the receiver for N.E. Development, argues on appeal that the interest charged pursuant to the loan agreement is usurious even if the $20,000 fee to Mr. Garies is not considered interest. He draws the Court's attention to the fact that the only document pertinent to this case which mentions the so-called "commercial loan commitment fee" is the loan agreement which he posits is, "at best, * * * contradictory and confusing." He further avers that the fee is not a "commitment from [American Steel] to make funds available to [N.E. Development] for any specified amount or for any specified period of time as required by the statute." Mr. Furness adds that Mr. Roche, the expert who testified at the hearing, "testified that the $50,000 charge did not comply with his understanding of a commitment fee." Lastly, he contends that, if this Court were to give credence to American Steel's arguments, "any userer [sic] could escape the provisions of §[]6-26-2 by simply re-characterizing the interest charge in excess of 21% as a 'commitment fee.'"

We begin our analysis with a brief discussion of the applicable statutes in the instant case. The clear provisions of § 6-26-2(a) read in pertinent part as follows:

> "[N]o person, partnership, association, or corporation loaning money to or negotiating the loan of money for another, except duly licensed pawnbrokers, shall, directly or indirectly, reserve, charge, or take interest on a loan, whether before or after maturity, at a rate which shall exceed the greater of twenty-one percent (21%) per annum * * * ."

If a loan is found to charge more than the prescribed maximum of 21 percent per annum, one looks to § 6-26-4(a) which provides:

> "Every contract made in violation of any of the provisions of § 6-26-2, and every mortgage, pledge, deposit, or assignment made or given as security for the performance of the contract, shall be usurious and void."

Section 6-26-2(c)(1) details various fees and costs which, for the purposes of calculating whether a contract is usurious, "shall not be" considered interest. The subsection of that statute pertinent to the instant case is § 6-26-2(c)(1)(iv), which includes the following among items that are not deemed to be interest:

> "Commercial loan commitment or availability fees to assure the availability of a specified amount of credit for a specified period of time or, at the borrower's option, compensating balances in lieu of the fees[.]"

The crux of the issue with which we are confronted is whether the $50,000 fee, which American Steel contends is nothing more than a "commercial loan commitment fee," is in fact a "[c]ommercial loan commitment * * * fee[]" pursuant to the terms of § 6-26-2(c)(1)(iv). Thus, our task is one of statutory construction.

When reviewing a statute, we first address whether or not the statute is clear and unambiguous. See State v. DiCicco, 707 A.2d 251, 253 (R.I. 1998); see also Diamante, 83 A.3d at 550. "If we find the statute to be unambiguous, we simply apply the plain meaning and our interpretive task is done." Diamante, 83 A.3d at 550; see DeMarco, 26 A.3d at 616; see also Green v. Biddle, 21 U.S. (8 Wheat.) 1, 89-90 (1823) ("[W]here the words of a law * * * have a plain and obvious meaning, all construction, in hostility with such meaning, is excluded."). We cease the task of construing a statute when we have determined that it has a plain meaning because "our ultimate goal is to give effect to the General Assembly's intent," Martone v. Johnston School Committee, 824 A.2d 426, 431 (R.I. 2003), and the plain language of a statute is the "best indicator of [legislative] intent." Olamuyiwa v. Zebra Atlantek, Inc., 45 A.3d 527, 534 (R.I. 2012) (internal quotation marks omitted); see Diamante, 83 A.3d at 550; see also Little v. Conflict of Interest Commission, 121 R.I. 232, 237, 397 A.2d 884, 887 (1979).

We are well aware that the General Assembly has opted for a rather draconian manner of dealing with the problem of usury. But we certainly cannot say that the General Assembly's strong medicine in this domain is arbitrary or wrongful, and our role is not to second-guess such legislative judgments. We are mindful of the ancient maxim dura lex sed lex ("The law is hard but it is the law."). Although the very learned hearing justice stated that there was "no good and clear definition" of a "commercial loan commitment fee" in Rhode Island law, upon our review of the statute in question, it is our respectful judgment that that term is defined clearly and unambiguously therein. See DeMarco, 26 A.3d at 616 (stating that "a clear and unambiguous statute will be literally construed") (internal quotation marks omitted). Under the plain language of the statute, a "[c]ommercial loan commitment * * * fee[]" is a fee to "assure the availability of a specified amount of credit for a specified period of time." See Downey, 996 A.2d at 1150. To hold otherwise would render that language moot and would violate our basic "canon of statutory construction," which provides that "the Legislature is presumed to have intended each word or provision of a statue to express a significant meaning, and the court will give effect to every word, clause, or sentence, whenever possible." State v. Bryant, 670 A.2d 776, 779 (R.I. 1996); see also State v. Reis, 430 A.2d 749, 752 (R.I. 1981). Consequently, what remains to be done is for us to simply apply the plain meaning of § 6-26-2(c)(1)(iv) to the loan agreement at issue in this case.

In the instant case, the so-called "commercial loan commitment fee" did not "assure the availability of a specified amount of credit for a specified period of time." Section 6-26-2(c)(1)(iv). According to the testimony at trial, after American Steel provided N.E. Development with $275,000 at the closing, American Steel would not be disbursing any further funds to N.E. Development pursuant to the agreement between the parties. Moreover, as Mr.

- 11 -

LaBonte's testimony reflected, N.E. Development had no expectation pursuant to the agreement between the parties that funds beyond the $275,000 would be available to it.[10] Thus, we are simply unable to conclude that the fee in the instant case was a "[c]ommercial loan commitment * * * fee[]" as that term is defined in § 6-26-2(c)(1)(iv).

Consequently, we come to the inescapable conclusion that the fee in the instant case was a part of the interest being charged on the loan. Thus, for a thirty-day loan of $275,000,[11] N.E. Development was to pay American Steel $325,000 plus one month of accrued interest on the $325,000 at a rate of 16 percent per annum. The record reflects a number of different calculations attempting to establish the actual amount of interest which was to be charged in the instant case once the $50,000 fee was included as interest. The results of those calculations vary widely but they all have one thing in common—each substantially exceeds the statutorily-allowed 21 percent interest.[12] Therefore, the hearing justice appropriately found the loan in the instant case to be usurious and, consequently, void pursuant to § 6-26-4(a).

---

[10] We remind the reader that, in addition to the testimony elicited at the hearing about the intent of the parties to this loan, Mr. Roche testified that a $50,000 commitment fee on a $275,000 loan was "[u]nreasonable" and that he had "[n]ever" seen "a situation where the commitment fee was paid at the time the loan was supposed to be paid off[.]"

[11] We have previously held that "[t]he standard for computation of the maximum interest and the test of the transaction is not the stated amount of a loan, but the amount of money actually received by the borrower." Burdon v. Unrath, 47 R.I. 227, 230, 132 A. 728, 729 (1926); see NV One, LLC v. Potomac Realty Capital, LLC, 84 A.3d 800, 805 (R.I. 2014) ("In order to determine whether an interest rate is usurious, the face amount of the loan is irrelevant; instead, the maximum allowable interest is calculated based on the amount actually received by the borrower."); see also Industrial National Bank of Rhode Island v. Stuard, 113 R.I. 124, 125, 318 A.2d 452, 453 (1974). As such, we have based our calculations of the interest rate in the instant case on the $275,000 that was "actually received by" N.E. Development.

[12] We note that American Steel does not appear to contest on appeal that, if the $50,000 fee is considered interest, the loan is usurious.
We also note that the calculations of the rate of interest in the instant case are also universally over the 21 percent maximum when only the $30,000 due to American Steel is considered interest and not the $20,000 fee intended for Mr. Garies.

Our conclusion is buttressed by our analysis in the recently decided case of NV One, LLC v. Potomac Realty Capital, LLC, 84 A.3d 800, 807-08 (R.I. 2014), relative to the intent of the General Assembly with respect to the enactment of the usury statutes. See Downey, 996 A.2d at 1150 ("[I]t is this [C]ourt's responsibility in interpreting a legislative enactment * * * to attribute to the enactment the meaning most consistent with its policies or obvious purposes.") (internal quotation marks omitted). In NV One, LLC, we stated that "it is clear that the Legislature intended an inflexible, hardline approach to usury that is tantamount to strict liability;" it was our opinion that that "rigid approach" was "borne out in the historically strict enforcement of the statute and its predecessors through the years." NV One, LLC, 84 A.3d at 807, 808; see, e.g., Burdon v. Unrath, 47 R.I. 227, 231, 132 A. 728, 730 (1926) (holding that, in relation to a usurious loan agreement, "[t]he intent of the lender was to do exactly what he did" and "[h]is mistake, if any, was one of law not of fact" which "is no excuse for the violation of the statute"). Moreover, we held that the "underlying policy consistent throughout [our past] decisions is readily apparent: Usurious interest rates are to be avoided at all costs and the onus is on the lender to ensure compliance with the maximum rate of interest."[13] NV One, LLC, 84 A.3d at 808. Thus, our construing of § 6-26-2(c)(1)(iv) is consistent with public policy and with the expressed intent of the General Assembly with respect to the usury statutes.

Accordingly, we hold that we perceive no error in the decision of the hearing justice that the so-called "commercial loan commitment fee" in the loan agreement before us was not a "[c]ommercial loan commitment * * * fee[]" within the meaning of § 6-26-2(c)(1)(iv) and that,

_____

[13] That principle is true even if the lender, as in the instant case, is comparatively inexperienced.

consequently, it was considered part of the interest on the loan, rendering the loan agreement usurious and void.

## C

### Usury Savings Clause

American Steel also argues that we should find the usury savings clause contained in the loan agreement to be enforceable and that, consequently, the savings clause in this case saves the loan from being usurious and void. Our recent pronouncement in NV One, LLC v. Potomac Realty Capital, LLC, 84 A.3d 800 (R.I. 2014) is entirely decisive as to that issue.[14] As such, we simply reiterate our holding in that case: In the State of Rhode Island, in loan agreements such as the one at issue in the instant case, "usury savings clauses are unenforceable." Id. at 810.

Accordingly, we hold that the loan agreement in the instant case was usurious and, therefore, void pursuant to § 6-26-2(a).

## III

### Conclusion

For the reasons set forth in this opinion, we affirm the order of the Superior Court. The record in this case may be remanded to that tribunal.

Justice Indeglia did not participate.

---

[14] While the parties provided this Court with well-considered and logical arguments with respect to the issue of the enforceability of usury savings clauses, we deem it worth noting that, at the time of briefing, the parties did not have the benefit of our February 18, 2014 decision in NV One, LLC v. Potomac Realty Capital, LLC, 84 A.3d 800 (R.I. 2014).



# RHODE ISLAND SUPREME COURT CLERK'S OFFICE

## *Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**  Lawrence C. LaBonte (American Steel Coatings, LLC) v. New England Development R.I., LLC et al.

**CASE NO:**  No. 2012-328-Appeal.
(PM 10-4650)

**COURT:**  Supreme Court

**DATE OPINION FILED:**  June 20, 2014

**JUSTICES:**  Suttell, C.J., Goldberg, Flaherty, and Robinson, JJ.

**WRITTEN BY:**  Associate Justice William P. Robinson III

**SOURCE OF APPEAL:**  Providence County Superior Court

**JUDGE FROM LOWER COURT**:

Associate Justice Michael A. Silverstein

**ATTORNEYS ON APPEAL:**

For Plainitff:  Paul DeMarco, Esq.

For Defendant:  Alden C. Harrington, Esq.